## Colwell et al. v. Holliday.

(Decided Oct. 10, 1933.)

A. T. W. MANNING and C. F. KELLY for appellants.
FOWLER, WALLACE & FOWLER for appellee.

Opinion of the Court by Creal, Commissioner—
Reversing.

On February 14, 1931, Sam. C. Colwell, then a. resident of the city of Lexington, died testate, and. thereafter his will was duly admitted to probate in. the Fayette county court. Under terms to which we shall presently again refer, his estate, including 1,000 shares of the capital stock of the Central Kentucky Dry Goods Company, a corporation, hereinafter refer-red to as the corporation, passed into the hands of his. widow, Vina Colwell, as executrix.

On January 31, 1931, Dora C. Holliday sold and conveyed to Vina Colwell a house and lot in the city of Lexington, and, as a part of the consideration for such conveyance, Mrs. Colwell executed and delivered. to the grantor four notes of $497.50 each, due in 12, 18, 24, and 30 months thereafter, respectively, bearing .in-terest from date, with a purchase-money lien retained. in the deed to secure their payment, secondary, how-ever, to other liens upon the property. The husband of grantor joined in the conveyance.

On June 26, 1931, these four notes, each bearing on its face the indorsement, "Paid in full, June 26, 1931," and followed by the signature of Dora C. Holliday, were delivered to Jesse Colwell, son of the maker.. At the same time the notes were delivered to Jesse Colwell he delivered to Mrs. Holliday a certificate or certificates representing 200 shares of the capital stock of the Central Kentucky Dry Goods Company with an assignment thereof to her signed by Mrs. Colwell. Shortly thereafter E. C. Holliday, husband of Dora C. Holliday, took the assigned certificates to the office of the corporation, where a transfer was made on its books and a certificate for the 200 shares issued to Mrs. Holliday.

On November 18, 1931, Dora C. Holliday instituted this action in the Fayette circuit court against Vina Colwell, individually and as executrix, and the Bankers' & Shippers' Insurance Company, and, in addition to the foregoing facts, alleged in her petition that some. time in June, 1931, Vina Colwell in person and through her agent, Jesse Colwell, and other representatives approached her to sell. some stock in the corporation; that, when she refused to buy, they offered to exchange.

200 shares thereof for the four lien notes, representing that Mrs. Colwell had authority to sell the stock which was free from any lien, incumbrance, or claim whatsoever, and that the corporation was in a prosperous condition; that it had paid dividends regularly of not less than 12 per cent. and, as high as 24 per cent., and was preparing to pay a dividend at the next dividend period; that, while the commissioner of finance had issued an order against the sale of any of the stock for less than $30 per share, Mrs. Colwell was willing to exchange stock for the notes on a basis of $10 per share; that arrangements had been made for the sale of a block of the company's stock at $30 per share, and that Mrs. Colwell would list plaintiff's stock in the sale and guarantee that she would receive $30 per share for the 200 shares going into the exchange; that, relying on these representations and covenants, she exchanged the four notes for the 200 shares of stock; that on October 2, 1931, the corporation was adjudged to be insolvent, and was placed in the hands of a receiver by the United States District Court of the Eastern District of Kentucky; that the representations made to her by Mrs. Colwell with respect to the solvency of the corporation and the payment of dividends were untrue and made for the fraudulent purpose of inducing plaintiff to purchase the stock or to exchange the notes therefor; that, at the time of the exchange, the stock was worthless, and known to Mrs. Colwell to be worthless, but these facts were unknown to plaintiff; that she had tendered back to Mrs. Colwell the certificate for the 200 shares of stock, and demanded a return of the four promissory notes, but defendant refused to receive the stock or to return the notes. It was further alleged that the attempted sale and transfer of the 200 shares of stock by Vina Colwell as executrix was void, of no effect, and passed no title to plaintiff because the executrix had not procured an order of a court of competent jurisdiction authorizing a sale or transfer of the stock as provided by section 4707, Kentucky Statutes.

It further appeared in the petition that defendant insurance company had insured the property conveyed to Mrs. Holliday by Mrs. Colwell against loss or damage by fire, and that, before the institution of the action, the property had been damaged by fire and an

adjustment agreed upon. She asked that the proceeds of the policy be paid into court; that defendant be directed to deliver to plaintiff the four notes, and that plaintiff be adjudged the owner thereof with a lien on the house and lot described in the petition to secure same; and that she be entitled to participate in the proceeds of the insurance after the satisfaction of prior liens to the extent of the balance due her.

By an amended petition the Alliance Insurance Company of Chicago, Ill., was made a party defendant. It was alleged that it had issued a policy of insurance on the house conveyed to defendant by plaintiff, and that it also had made an adjustment of defendant's claim arising out of the partial destruction of the residence by fire, and it asked for the same relief in regard to the proceeds of this policy as it asked in regard to the proceeds of the policy referred to in the original petition.

After a demurrer and motion to elect were overruled, the defendant by answer traversed the material allegations of the petition, and alleged that, under the provisions of the will of Sam C. Colwell, defendant was given authority to sell and transfer the capital stock in the corporation which came into her hands without first procuring an order of the court. The answer was also made a cross-petition against plaintiff, and it was alleged that the notes had been satisfied in full and that defendant was entitled to have the lien retained in the deed released, and relief was asked accordingly. This action was consolidated with an ex parte action which had been instituted by defendant, in which she set up the alleged exchange of the 200 shares of stock for the four promissory notes, and asked that the transfer of the stock be approved and confirmed by the court. There is also in the record a writing signed by all the children and devisees of Sam C. Colwell ratifying the sale of the 200 shares of stock.

After proof was taken, plaintiff filed an amended petition to conform to the proof, and alleged that, relying upon the statements and representations of defendant, her agents and representatives, as set out in the original petition, she exchanged the four promissory notes for 200 shares of stock in the corporation only upon the condition that defendant would put the stock into a sale of a block of stock which had been made,

and out of the proceeds thereof would pay plaintiff the principal and interest of the notes, but that, in the event the sale was not consummated, defendant would return to plaintiff the notes and take back the stock, and that the lien retained to secure the payment of the notes should not be released of record until the notes were fully paid; that, since the filing of the original petition, one of the notes had matured, and that, under an order of the court, there had been paid into the hands of the clerk of the court as the proceeds of a fire insurance policy on the house covered by the lien a sum sufficient to pay the note and interest; and that plaintiff was entitled to have the note and interest paid out of such fund.

After disposing of a number of exceptions to depositions to which, under the conclusions we have reached, it will be unnecessary to refer, it was adjudged by the chancellor that plaintiff was entitled to the relief sought, and defendant is prosecuting this appeal.

Mrs. Holliday testified that, prior to the day she turned the notes over to Jesse Colwell and received the assigned certificate of stock, Mrs. Colwell had often talked to her about the stock in the corporation, indicating that it was good stock and paying large dividends regularly. Both she and her husband testified that, when Jesse Colwell proposed to exchange the stock for the notes, he represented to them that the corporation was solvent, paid large dividends annually, and would pay a dividend at the next dividend paying period; that, upon their refusal to accept stock in satisfaction of the notes, he represented to them that there was some sort of plan for a sale of a large block of stock in the corporation and that, if Mrs. Holliday would turn over the notes and have 200 shares of the stock transferred to her, this stock would be placed in the sale at $30 per share, and the notes would be paid out of the proceeds, but, in the event the sale was not consummated, the notes would be returned to Mrs. Holliday, and the stock would be taken up by Mrs. Colwell. They further testified that Jesse Colwell repeatedly assured them that he was making an effort to dispose of the stock and to pay the notes, but that, if he failed to do so, he would return the notes and take up the stock. Mr. Holliday testified that finally at his home, when he insisted that Jesse Colwell comply with his

contract to pay the notes or to return them and take up the stock, the latter left, saying he would return with the money or the notes within a very short time. He failed to do so, and later told Mr. Holliday that his mother refused to return the notes, and he could do nothing with her, and indicated that Mrs. Holliday would have to look to the court for relief. Teddy Holliday, a son of appellee, testified that he was at home and heard the conversation between Jesse and his father, and his evidence fully corroborates the latter.

It is in evidence that the corporation operated a system of chain stores known as the Noble Stores; that, shortly after the organization of the corporation, Sam C. Colwell sold to the corporation his store at Irvine, Ky., and acquired the stock owned at the time of his death; that both he and his son were employed by the corporation, the son serving as assistant manager and manager of one of its many stores and for a time as shipping clerk at the company's warehouse in Louisville. There is evidence by Mr. Holliday, Nathan Levy, and possibly others that, at a meeting of stockholders of the company held in Lexington about the time the corporation went into the hands of a receiver, Jesse Colwell stated he had known for about 18 months that the corporation was insolvent or in bad financial condition. It is also shown that Mrs. Colwell employed a Methodist minister by the name of Fryman to sell the stock held by her, and there is much evidence of the activities of Mr. Fryman and Jesse Colwell in an attempt to dispose of stock at Lexington as well as at many other places. Other than the stock in controversy, they only succeeded in disposing of about 12 shares; the price realized being $30 per share. Mr. Holliday testified that he and Sam C. Colwell had been friends for years before the latter's death, and, because he had confidence in Jesse Colwell and believed he would keep his word, and out of a desire to assist him and his mother in disposing of the stock, he consented to the transaction as detailed by him and his wife.

Mrs. Colwell denied that she had any conversation with, or made any statements to, Mrs. Holliday with reference to the stock in the corporation, and she and her son both testified that they thought up until about the time the corporation went into the hands of

a receiver it was in good condition and the stock was valuable. As her reason for exchanging 200 shares of stock for the notes at the price of $10 per share, Mrs. Colwell said she wanted her home clear of the lien, and that she was constantly being annoyed by persons to whom Mrs. Holliday was proposing to sell the notes coming to her home to inspect the property and inquire about the notes.

According to the evidence of Jesse Colwell, there was an unconditional exchange of the stock for the notes, and he did not promise to sell the stock and pay the notes nor to return the notes and take up the stock in the event he was not successful in making a sale. He denied that he made any false or fraudulent representations as to the value of the stock or as to the solvency of the corporation. He testified that, aside from his work as assistant manager and manager of a store and as shipping clerk, he was not acquainted with the business or affairs of the corporation, and had no opportunity of knowing whether its business as a whole was being transacted at a profit. He denied that he stated at a stockholder's meeting about the time the receiver was appointed that he had known for about 18 months the company was insolvent, but testified that he did say at the meeting that, according to a statement of the corporation's condition which had been shown him by another, it had been insolvent for 18 months.

Without going into a further detailed statement of the large volume of evidence, it may be said that the testimony of plaintiff and her husband strongly tends to support the allegations of the petition as amended, and the evidence of other witnesses introduced by them corroborates them in many details and lends color to their evidence. On the other hand, the evidence of Mrs. Colwell and her son is equally calculated to establish her defense; therefore, in determining the weight to be given the evidence, consideration must be given to certain outstanding significant facts.

Mr. Holliday, while yet active, has passed the meridian of life, and for 20 years or more has been engaged in the practice of law, having represented individuals and companies of importance in the acquisition of coal and mineral rights. He has also been engaged for

himself and with another in the real estate business. Mrs. Holliday has bought and sold real estate, but has had the benefit of her husband's advice and assistance in such transactions. At the time of the transaction out of which this litigation grows, Jesse Colwell was about 22 years of age, and, so far as the record discloses, whatever knowledge he had of business affairs was acquired in his work for this corporation. While the evidence of Mrs. Colwell would indicate that she is a cultured, intelligent woman, there is nothing to disclose the extent of her training or experience in business. Mrs. Holliday wrote across the face of the notes, "Paid in full," affixed her signature, and placed them in custody of Jesse Colwell. Her husband procured the stock to be transferred to her, and she retained the certificate until this suit was instituted and after the corporation had gone into the hands of a receiver. These salient facts revealed by the record relative to the formalities attending the transaction, the position of the parties, and their opportunity to know and appreciate the consequences of their acts go far toward discrediting the evidence of appellee and her husband that they were deceived and misled by Jesse Colwell and induced to part with valuable property under such a hazardous and unbusinesslike arrangement. Even though they were led to believe a sale of the stock could be facilitated by having it stand in the name of Mrs. Holliday, there is and can be no explanation why it was thought necessary to cancel and surrender the notes to effectuate that purpose. In fact, there is no evidence of a representation that a cancellation and surrender of the notes would be necessary to effect a sale of the stock.

It is manifest from a reading of the record that Mr. and Mrs. Holliday are above the average in intelligence, discretion, and business training, and their acts should be measured by standards fixed for ordinarily prudent and discreet persons. Persons of ordinary prudence, discretion and business experience do not part with their property with evidence of surrender of title in circumstances testified to by Mr. and Mrs. Holliday. No matter what confidence they had in the integrity and honesty of purpose of Mrs. Colwell and her son, they knew the uncertainty of life, and that, while they dealt with Mrs. Colwell through her son today, they

might be called to deal with their heirs or representatives thereafter, and be confronted with these notes marked "Paid," and Mr. Holliday as a lawyer knew in such circumstances their lips would be sealed, and they would be left without any extrinsic evidence to establish their claim that the notes had not been paid.

Our conclusion is that the evidence clearly preponderates to show an absolute and unconditional trade or exchange of the four notes for the 200 shares of stock. And in reaching this conclusion we have taken into account the significance of evidence that the stock was exchanged at a price much less than it was thought or represented to be worth at the time, and the lien retained to secure the payment of the notes was not released of record.

Although weight and deference should be given to a chancellor's finding on facts, it is the duty of the appellate court to weigh and determine the effect to be given to the evidence and to reverse a judgment not found to be in accord therewith. Taber v. McGregor, 192 Ky. 600, 234 S. W. 194; Roberts v. Aker & Vogt, 203 Ky. 468, 262 S. W. 609; Hatcher-Powers Shoe Co. v. Kirk, 233 Ky. 19, 24 S. W. (2d) 903; Ray's Ex'r v. Bridges, 247 Ky. 459, 57 S. W. (2d) 492.

In support of their contention that appellant could not sell and pass title to the stock in controversy without first procuring an order of court of competent jurisdiction authorizing such sale, counsel cite and rely on section 4707, Kentucky Statutes.

It is manifest, as has been indicated by this court in former opinions, this statute was intended to protect and conserve stocks, bonds, and other dividend bearing securities in the interest of the estate or the beneficiaries. Whether one may invoke this statute merely in avoidance of his contract to purchase such stock from a fiduciary and not in the interest of the estate or the beneficiaries is a question we need not determine here, since for other reasons the statute has no application in this instance. This court has consistently held that this statute was intended only to control the exercise by fiduciaries of their general power to sell and transfer dividend paying stocks, bonds, or securities, and not to interfere with or restrict the powers of a testator to invest his executor with author-

ity to sell and dispose of such securities nor in any way to restrict the executor in the exercise of such powers granted by the testator. Trimble's Ex'r v. Lebus et al., 94 Ky. 304, 22 S. W. 329, 15 Ky. Law Rep. 85; Crenshaw v. Ware's Ex'r, 148 Ky. 196, 146 S. W. 426; Barth et al. v. Fidelity & Columbia Trust Co., etc., 188 Ky. 788, 224 S. W. 351.

The will of Sam C. Colwell gives to his executrix, Vina Colwell, unrestricted power to sell and dispose of any property left by him. From what we have already said it follows that appellee was not entitled to the relief sought by her petition and granted by the judgment, but that appellant is entitled to the relief sought in her cross-petition.

Wherefore the judgment is reversed, with directions to enter judgment in conformity with this opinion.

The whole court sitting.